FILED

JUN 13 2013

Clerk, U.S. District Court
District Of Montana
Missoula

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| LOIS M. BEAR (fka KELTGEN),<br><br>Plaintiff,<br><br>vs.<br><br>CAROLYN W. COLVIN, Acting<br>Commissioner of Social Security,<br><br>Defendant. | CV 12–62–M–JCL<br><br>ORDER |

Plaintiff Lois Bear brings this action under 42 U.S.C. § 405(g) seeking

judicial review of the decision of the Commissioner of Social Security denying her

application for disability insurance benefits under Title II of the Social Security

Act ("the Act"), 42 U.S.C. §§ 401-433.

Bear filed for benefits on July 24, 2006, alleging disability since November

5, 2005, due to degenerative disc disease, fibromyalgia, and injuries she sustained

in a car accident. Tr. 167, 199. Bear's application was denied, and she requested

an administrative hearing. Tr. 134-38. A hearing was held, and on April 2, 2008,

the ALJ issued a decision finding that Bear was not disabled within the meaning

PAGE 1

of the Act. Tr. 661-77. The Appeals Council denied Bear's request for review, and she sought judicial review. On February 5, 2010, this Court issued an order reversing the ALJ's decision and remanding the case for proper evaluation of the lay witness testimony provided by Bear's husband. Tr. 685-712. The ALJ convened a second hearing and once again found that Bear was not disabled at any time from her alleged onset date through December 31, 2006, the date she was last insured.[1] Tr. 627-43. The Appeals Council denied Bear's request for review, thereby making the ALJ's decision the agency's final decision for purposes of judicial review. Tr. 1092-94. Jurisdiction vests with this Court pursuant to 42 U.S.C. § 405(g).

Bear was 51 years old at the of her alleged onset date, and 52 years old when her insured status expired in 2006.

## I.    **Standard of Review**

This Court's review is limited. The Court may set aside the Commissioner's decision only where the decision is not supported by substantial evidence or where

---

[1]To qualify for disability insurance benefits, Bear had to establish that she was disabled on or before December 31, 2006, the date she was last insured for disability purposes. In other words, Bear had to establish that her impairments prevented her from performing any substantial gainful activity for twelve consecutive months beginning on or before that date. *See Flaten v. Sec'y. Health and Human Servs.*, 44 F.3d 1453, 1460 (9th Cir. 1995); *Morgan v. Sullivan*, 945 F.2d 1079, 1080 (9th Cir. 1991).

PAGE 2

the decision is based on legal error. *Bayliss v. Barnhart*, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005); *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Widmark v. Barnhart*, 454 F.3d 1063, 1070 (9th Cir. 2006).

"The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities." *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001). This Court must uphold the Commissioner's findings "if supported by inferences reasonably drawn from the record." *Batson v. Commissioner of Social Security Administration*, 359 F.3d 1190, 1193 (9th Cir. 2004). "[I]f evidence exists to support more than one rational interpretation," the Court "must defer to the Commissioner's decision." *Batson*, 359 F.3d at 1193 (*citing Morgan v. Commissioner*, 169 F.3d 595, 599 (9th Cir. 1999). This Court "may not substitute its judgment for that of the Commissioner." *Widmark*, 454 F.3d at 1070 (*quoting Edlund*, 253 F.3d at 1156).

## II. Burden of Proof

To establish disability, a claimant bears "the burden of proving an 'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which...has lasted or can be expected

PAGE 3

to last for a continuous period of not less than 12 months.'" *Batson*, 359 F.3d at 1193-94 (*quoting* 42 U.S.C. § 423(d)(1)(A)).

In determining whether a claimant is disabled, the Commissioner follows a five-step sequential evaluation process. 20 C.F.R. § 404.1520. The claimant bears the burden of establishing disability at steps one through four of this process. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). At the first step, the ALJ will consider whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(I). If not, the ALJ must determine at step two whether the claimant has any impairments that qualify as "severe" under the regulations. 20 C.F.R. § 404.1520(a)(4)(ii). If the ALJ finds that the claimant does have one or more severe impairments, the ALJ will compare those impairments to the impairments listed in the regulations. 20 C.F.R. § 404.1520(a)(4)(iii). If the ALJ finds at step three that the claimant has an impairment that meets or equals a listed impairment, then the claimant is considered disabled. 20 C.F.R. § 404.1520(a)(iii). If, however, the claimant's impairments do not meet or equal the severity of any impairment described in the Listing of Impairments, then the ALJ must proceed to step four and consider whether the claimant retains the residual functional capacity (RFC) to perform his or her past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant establishes an inability to engage in past work,

PAGE 4

the burden shifts to the Commissioner at step five to establish that the claimant can perform other work in the national economy. 20 C.F.R. § 404.1520(a)(4)(v).

## III. **Discussion**

Following the steps in the sequential evaluation process, the ALJ first found that Bear had not engaged in substantial gainful activity during the period between her alleged onset date in November 2005 and the expiration of her insured status in December 2006. Tr. 629. The ALJ found at step two that Bear suffered from the following severe impairments: degenerative disc disease and fibromyalgia. Tr. 630. At step three, the ALJ determined that Bear did not have an impairment or combination of impairments that met or medically equaled any impairment described in the Listing of Impairments. Tr. 631. The ALJ also found that while Bear's "medically determinable impairments could reasonably be expected to produce the alleged symptoms," her "statements concerning the intensity, persistence, and limiting effects of th[o]se symptoms" were not entirely credible. Tr. 633. Having done so, the ALJ determined that Bear retained the residual functional capacity to perform a limited range of light work. Tr. 632. Although the ALJ found that Bear could not return to her past relevant work, he concluded that there remained a significant number of jobs in the economy that she could perform, including light level work as a parking lot attendant, photocopy machine

PAGE 5

operator, or paper inserter. Tr. 642.

## A. Duty to Develop the Record

Bear argues the ALJ failed to fully develop the record because he "did not take testimony or even hear argument at the eight minute remand hearing." Dkt. 17, at 24. She claims he should have allowed her "to provide testimony about the issues that led to his prior rejection of her testimony about her limitations" and taken testimony "from additional lay witnesses." Dkt. 17, at 24.

It is undisputed that an "ALJ in a social security case has an independent "'duty to fully and fairly develop the record and to assure that the claimant's interests are considered.'" *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001) (*quoting Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996)). The "ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Mayes v. Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001).

Consistent with this Court's remand order, the ALJ convened an administrative hearing on July 1, 2010, for the purpose of considering the lay witness testimony of Bear's husband, Edward Keltgen ("Keltgen"). Tr. 654-60; 711. By that time, however, Bear and Keltgen were divorced. Tr. 656-57.

PAGE 6

Keltgen did not attend the remand hearing. Because Keltgen was not at the hearing, the ALJ decided his task was limited to revisiting his original decision and setting forth reasons for either accepting or rejecting Keltgen's original testimony. Tr. 656. The ALJ explained that, under the circumstances, he would not be taking any testimony at the hearing and asked Bear's counsel if he was in agreement. Tr. 657.

Bear's counsel did not object to the ALJ's decision to not take additional testimony, and did not ask that any other lay witnesses be allowed to testify. Bear's counsel explained that he had submitted additional evidence that he believed related back to the date last insured, but voiced no objection to the ALJ's decision to not take additional testimony. As Bear's counsel put it, "I understand what you're saying about the husband's testimony and then not taking more testimony." Tr. 657-58. He told the ALJ he was "not going to get in a big argument with you, I guess, about taking additional testimony from my client or anything like that." Tr. 659. Bear's counsel then offered to provide the ALJ with a transcript of Keltgen's testimony from the prior hearing. Tr. 658. With that understanding, the remand hearing ended.

The sole basis for the Court's remand order was to give the ALJ the opportunity to adequately address Keltgen's lay testimony. Keltgen was not

available to testify at the hearing on remand, and Bear did not ask the ALJ to take any additional testimony or hold the record open for a supplemental statement from Keltgen. The ALJ complied with the Court's remand order by reevaluating Keltgen's prior testimony.

Bear argues the ALJ did not adequately develop the record because he did not call a medical advisor send interrogatories to unspecified medical providers. Dkt. 17, at 25. But because the sole basis for the remand was to allow for proper evaluation of Keltgen's testimony, and the record otherwise contained sufficient evidence for the ALJ to reach a decision and was not ambiguous, the ALJ's duty to develop the record any further was not triggered.

## B. Lay Testimony

The specific issue to be addressed more thoroughly on remand was the credibility of Keltgen's lay testimony.

It is well-established that the "ALJ must consider lay witness testimony concerning a claimant's ability to work." *Stout v. Commissioner*, 454 F.3d 1050, 1053 (9th Cir. 2006) (citing *Dodrill v. Shalala*, 12 *F.3d 915, 919 (9th Cir. 2003); 20 C.F.R. §§ 404.1513(d)(4) & (e), 416.913(d)(4)* & (e)). "If the ALJ wishes to discount the testimony of lay witnesses, he must give reasons that are germane to each witness." *Stout*, 454 F.2d at 1053 (quoting *Dodrill*, 12 F.3d at 919).

PAGE 8

Competent lay witness testimony "cannot be disregarded without comment." *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996).

In a decision that post-dated this Court's February 2010 remand order, the Ninth Circuit made clear that the ALJ need not "discuss every witness's testimony on a individualized, witness-by-witness basis." *Molina v. Astrue*, 674 F.3d 1104, 1114 (9th Cir. 2012). "Rather, if the ALJ gives germane reasons for rejecting testimony by one witness, the ALJ need only point to those reasons when rejecting similar testimony by a different witness." *Molina* 674 F.3d at 1114. Moreover, "an ALJ's failure to comment upon lay witness testimony is harmless where 'the same evidence that the ALJ referred to in discrediting [the claimant's] claims also discredits [the lay witness's]claims.'" *Molina v. Astrue*, 674 F.3d at 1122 (quoting *Buckner v. Astrue*, 646 F.3d 549, 560 (8th Cir. 2011)).

Here, the ALJ did as directed on remand and thoroughly considered Keltgen's testimony. Ultimately, the ALJ provided sufficient reasons for finding his testimony only partially believable. The ALJ began by emphasizing that "Keltgen's testimony on February 15, 2008, was given after [Bear's] date last insured had already been expired for over one year. " Tr. 639. The ALJ found that while "[h]is testimony of her limitations at that time and his observations of her at that time may have been an accurate picture of her condition in 2008," the

evidence relating to the period before her insured status expired in December 2006 "was inconsistent with disabling limitations and symptoms." Tr. 639. The ALJ focused on "several inconsistencies of disabling limitations," noting that Bear reported engaging a "wide-range of activities of daily living" like attending bible study, which undermined Keltgen's testimony. Tr. 639. This was an adequate basis for discrediting Keltgen's testimony.

## C.    Severe Impairments

As she did in her prior appeal, Bear again argues the ALJ erred at step two by not including depression and a sleep disorder among the list of her severe impairments.

An impairment is "severe" if it significantly limits the claimant's ability to perform basic work activities. 20 C.F.R. § 416.921. An impairment may be considered non-severe if the evidence establishes only a slight abnormality that has no more than a minimal effect on an individual's ability to work. *See* SSR 85-28; *Yuckert v. Bowen*, 841 F.2d 303, 306 (9th Cir. 1988). The claimant bears the burden of establishing the severity of an alleged impairment by providing medical evidence consisting of signs, symptoms, and laboratory findings. 20 C.F.R. § 416.908.

The ALJ acknowledged that Bear suffered from depression, but found the

impairment "did not cause more than minimal limitation on [her] ability to perform basic mental work activities and was therefore nonsevere." Tr. 630. This finding was amply supported by the record. Bear's medical records consistently reflect that while she suffered from intermittent depression over the years, the impairment was well controlled on medication. As the ALJ noted, for example, medical records from Big Sky Medicine from 1990 through 1994 reflected that Bear suffered from intermittent, situational depression relating to her divorce and other stressors. Tr. 630; 468-86. But Bear does not point to anything in those notes suggesting that her depression was so severe as to cause here significant limitations.

Bear's other medical records are much the same. In August 2005, Bear reported doing well on Zoloft. Tr. 372. In February 2007, chiropractor Thomas Fullerton examined Bear and remarked in his report that she had a history of "occasional depression." Tr. 442. In records dating back to 1972, Bear's treating gynecologist occasionally mentioned depression. Tr. 960-1029. In July 2005, for example, Bear's doctor wrote that she was "having menopausal symptoms and want[ed] to go on an antidepressant." Tr. 964. Several years earlier, in May 2001, Bear's doctor mentioned that she had "[d]epression, controlled with Serzone." Tr. 971. And in April 1996, Bear asked for and was given "samples of Prozac." Tr.

PAGE 11

978.  The ALJ agreed in light of these records that Bear had a history of depression, but found it significant that she had never been referred for or received treatment from a mental health care provider.  Tr. 630.

Bear claims that ALJ erred by not giving more weight to a medical source statement form completed by licensed professional counselor, Ann Scott-Markle, in May 2007.  Tr. 445.  Scott-Markle indicated by check-mark that Bear's mental impairments cause her a number of moderate and marked limitations.  Tr. 445-48. The ALJ considered Scott-Markle's opinion, but rejected it on the ground that she was not an acceptable medical source and because it was not supported by "her limited progress notes."  Tr. 630.  Scott-Markle's notes are limited to two pages, and refer to Bear's divorce and other stressors in her life.  Tr. 513- 14.  The ALJ reasonably found that those notes, which do not even mention depression or any other mental impairment, were not indicative of the severe limitations Scott-Markle later identified.  Tr. 630.

Bear also argues the ALJ erred by not considering a June 2010 report by examining psychologist Dr. David Mahoney.  Citing the form completed by Scott-Markle, Dr. Mahoney found based on his review of the medical records that it was "impossible to agree with the strength of all [Scott-Markle's] conclusions" but found there was "the possibility that her observations were indeed accurate at the

time." Tr. 1082. Dr. Mahoney diagnosed Bear with a generalized anxiety disorder, but did not diagnose depression. Tr. 1083. It was his opinion, however, that Bear would likely "decompensate into more serious mental states" were she to return to work. Tr. 1083.

The ALJ did not specifically address Dr. Mahoney's report in his step two analysis, but addressed it thoroughly in his subsequent discussion of the medical records. Tr. 638. The ALJ noted that Dr. Mahoney had seen Bear only once, on a referral from her disability attorney, and "spent a total of two hours interviewing [her] and reviewing her medical records." Tr. 638. The ALJ permissibley found that because Dr. Mahoney had not examined Bear until June 2010 – approximately three and a half years after her insured status expired – his opinion was of little help in assessing the severity of her depression during the relevant period. Tr. 638. And as the ALJ also noted, to the extent Dr. Mahoney attempted to assess the severity of Bear's depression before December 2006, he relied almost exclusively on Scott-Markle's opinion. Tr. 639; 1082. Because the ALJ appropriately discounted Scott-Markle's conclusory opinion on the ground that it was not supported by her counseling notes, he permissibly concluded that Dr. Mahoney's retrospective opinion was likewise entitled to little weight.

Bear next claims the ALJ erred by not considering an independent medical

PAGE 13

examination report prepared by Dr. Michael Righetti in January 1997. Tr. 273-77. But because Dr. Righetti's report predates Bear's alleged onset date by more than eight years, Bear fails to explain what bearing the report might have on the severity of her depression during the relevant period.

Bear also claims that her depression was "complicated by other conditions the ALJ found non-severe without discussing them, such as her severe insomnia." Dkt. 17, at 7. The only record Bear cites to in support of this argument is a June 1995 treatment note which states that she had "Insomnia, severe." Tr. 333. Because this single note predates Bear's alleged November 2005 onset date by ten years, the ALJ was not required to consider it. Because Bear has not pointed to any other evidence that she suffers from insomnia, severe or otherwise, she has not shown that the ALJ somehow erred by omitting a sleep disorder from the list of her severe impairments.

To the extent Bear argues that the ALJ erred by not following the special technique for evaluating medically determinable mental impairments, she is mistaken. The special technique requires that an ALJ first determine whether a claimant has a medically determinable mental impairment, and rate the degree of functional limitation in four areas: activities of daily living, social functioning, concentration/ persistence/pace, and episodes of decompensation. 20 C.F.R. §

404.1520a(b)-(c). The ALJ must then determine the severity of the mental impairment based in part on the degree of functional limitation, and "if the impairment is severe, proceed to step three of the disability analysis to determine if the impairment meets or equals a specific listed mental disorder. *Keyser v. Commissioner of Social Security*, 648 F.3d 721, 725 (9th Cir. 2011) (citing 20 C.F.R. § 404.1520a(c)(1)&(2)). The ALJ must document his application of the technique in his written decision by "incorporating the pertinent findings and conclusions based on the technique" and including "a specific finding as to the degree of limitation in each of the functional areas."[2] *Keyser*, 648 F.3d at 725.

The ALJ did just that, specifically finding that Bear's had mild limitations in daily living, social functioning, and concentration/persistence/pace. Tr. 631. He further found that Bear had not experienced any episodes of decompensation. Tr. 631. As the records discussed above reflect, the ALJ's assessment was supported by substantial evidence. The ALJ's decision adequately documented his application of the special technique, and Bear's argument to the contrary is misplaced.

### D.    Credibility

---

[2] Alternatively, the ALJ may "complete a PRTF and append it to the decision." *Keyser*, 648 F.3d at 725. The ALJ did not append a PRTF to the decision in this case.

Bear argues the ALJ failed to cite sufficiently clear and convincing reasons for discrediting her prior testimony.

The ALJ can reject subjective testimony as to the severity of a claimant's symptoms only by citing specific, clear and convincing reasons for doing so. *Smolen. v. Chater*, 80 F.3d 1273, 1283-84 (*citing Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993)). To assess a claimant's credibility, the ALJ may consider ordinary credibility evaluation techniques, unexplained or inadequately explained failure to seek or follow treatment, and the claimant's daily activities. *Smolen*, 80 F.3d at 1284. However, "[g]eneral findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaint." *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998) (*quoting Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995)).

Here, the ALJ found Bear less than entirely credible for a number of reasons. To begin with, he found that "[h]er testimony regarding her limitations [was] inconsistent with the medical evidence." Tr. 633. For example, Bear testified that she spent her days at home, resting, either in a chair or on her bed. Tr. 39. She said she could only sit for 10 to 15 minutes at a time and would have to rest after 20 to 30 minutes of housework. Tr. 40. While Bear complained of disabling limitations beginning in November 2005, the ALJ noted that most of her

PAGE 16

medical records predated her alleged onset date. Tr. 634. Certain records from the relevant period were not consistent with Bear's testimony. In October 2006, for example, Bear's physical therapist observed that Bear's range of motion was within normal limits, reported that her upper and lower extremity strength was 4/5, and she was only mildly tender to the touch. Tr. 501-2; 636. While it would not have been appropriate for the ALJ to discredit Bear's testimony based entirely on the lack of objective medical evidence, it was one legitimate factor for the ALJ to consider in his credibility analysis. *See e.g. Lingenfelter v. Astrue*, 504 F.3d 1028, 1040 (9th Cir. 2007); *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005).

The ALJ also discounted Bear's testimony in part because she engaged in activities that were inconsistent with her alleged limitations. Bear testified that her fibromyalgia was "like having the flu all the time, and I just ache all the time, and I hurt, and I just have no strength to do anything else." Tr. 40. As the ALJ noted, however, Bear had vacationed in Florida after her alleged onset date and reported going to Bible Study Group twice a week and visiting with family and friends two to three times a week. Tr. 639. Notes from Keltgen's physical therapist in October 2006 indeed reflect that she had been out of town for a month and half. Tr. 501. The ALJ permissibly found that Bear's "going on a vacation to Florida for that length of time and her other reported daily activities were highly

PAGE 17

inconsistent with her claim for total disability." Tr. 636.

Next, the ALJ found the fact that Bear had filed for unemployment benefits after her alleged onset date was inconsistent with her allegations of disability. The ALJ properly relied on the fact that Bear held herself out as capable of working even after her alleged onset date when assessing her credibility. *See Copeland v. Bowen*, 861 F.2d 536, 542 (9th Cir. 1988)(stating that a claimant who received unemployment insurance benefits apparently considered himself capable of working and held himself out as available for work).

The ALJ also noted "evidence that strongly suggested that [Bear] was seeking disability so that she would not have to work." Tr. 634. For example, the ALJ pointed to Scott-Markle's treatment notes from January 8, 2008, which reflected that Bear wanted to get a divorce and get disability benefits, and that her attorney had advised her she would get more in benefits if she got divorced. Tr.634; 513.

The ALJ also discounted Bear's subjective complaints in part based on the fact that her treatment had "been essentially routine and /or conservative in nature." Tr. 636. The ALJ found it significant that while Bear had received some physical therapy and chiropractic care, she did not require surgery and was not treated by or referred to a orthopedic specialist. Tr. 636. *Parra v. Astrue*, 481

PAGE 18

F.3d 742, 751 (9th Cir. 2007) (stating that "evidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding the severity of an impairment"); *Burch v Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005) ("The ALJ is permitted to consider lack of treatment in his credibility determination.").

These constitute sufficiently clear and convincing reasons for finding Bear's subjective testimony not entirely credible

### E.     Medical Opinions

Bear argues the ALJ failed to cite sufficient reasons for rejecting various medical opinions.

A treating physician's opinion is entitled to greater weight than that of an examining physician on the basis that he has a "greater opportunity to observe and know the patient." *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995). An examining physician's opinion in turn "carries more weight than a reviewing physician's." *Holohohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001). The weight given a treating or examining physician's opinion depends on whether it is supported by sufficient medical data and is consistent with other evidence in the record. 20 C.F.R. § 404.1527(c)(2).

To discount the controverted opinion of a treating physician, the ALJ must provide "'specific and legitimate reasons' supported by substantial evidence in the

record." *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) (quoting *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)). Among the situations in which the ALJ must cite such specific and legitimate reasons is when a treating physician's opinion is contradicted by a nontreating physician, and the nontreating physician's opinion is not based on independent clinical findings, or is based on the same information used by the treating physician. *Andrews*, 53 F.3d at 1041. The ALJ can accomplish this by setting forth "a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).

Similar standards apply to the ALJ's evaluation of an examining physician's opinion. *Widmark v. Barnhart*, 454 F.3d 1063, 1066 (9th Cir. 2006). Where the opinion of an examining physician is contradicted by another doctor, the ALJ can reject it only by citing "specific and legitimate reasons that are supported by substantial evidence in the record." *Widmark*, 454 F.3d at 1066 (*quoting Lester*, 81 F.3d at 830-31).

While the opinions of non-treating, non-examining physicians may under certain circumstances constitute substantial evidence, this is so only if they "are consistent with independent clinical findings or other evidence in the record." *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002).

### 1. *Dr. VanBelois*

Bear argues the ALJ failed to adequately explain why he rejected the opinion of treating physician Dr. VanBelois, as set forth in a physical capacities assessment form she completed in February 2008. Tr. 598. Dr. VanBelois identified limitations incompatible with even sedentary work, noting for example that Bear would need to lie down for more than one hour at a time at least twice during an 8-hour work day, and could not sit, stand or walk for even one hour at a time. Tr. 598-607.

The ALJ acknowledged Dr. VanBelois's opinion, but rejected it for a number of reasons. Tr. 637. First, the ALJ noted that Dr. VanBelois did not begin treating Bear until March 2007 - approximately two months after the date she was last insured for disability benefits. Tr. 637; 504-05. Second, the ALJ explained that while Dr. VanBelois "did have a treating relationship with [Bear], the treatment history was quite brief," having actually examined Bear on only three occasions. Tr. 637. *See* 20 C.F.R. § 404.1527(d)(2)(i)&(ii)(explaining that the length and extent of the treatment relationship are properly considered in determining how much weight is to be accorded a treating physician's opinion). Third, the ALJ declined to give great weight to Dr. VanBelois's opinion because she "apparently relied quite heavily on the subjective report of symptoms and

PAGE 21

limitations provided by [Bear], and seemed to uncritically accept as true most, if not all, of what [Bear] reported." Tr. 637. As discussed above, the ALJ provided sufficiently clear and convincing reasons for discrediting Bear's subjective testimony, which means that it was in turn proper for him to reject Dr. VanBelois's opinion to the extent it was premised on that subjective testimony. *See Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2009). That Dr. VanBelois based her opinion at least in part on Bear's subjective complaints is evident from the fact that her contemporaneous treatment notes do not contain objective medical findings indicative of the extreme limitations identified on the form. Tr. 503-12.

The ALJ saw the same discrepancy, citing as his final reason for rejecting Dr. VanBelois's February 2008 opinion the fact that it was "inconsistent with her own treatment notes which failed to reveal the type of significant clinical and laboratory abnormalities one would expect if [Bear] were in fact disabled, and the doctor did not specifically address that weakness." Tr. 637. As the ALJ noted, for example, Dr. VanBelois wrote after examining Bear for the first time in March 2007 that she presented as a "middle aged woman in no acute distress," had intact range of motion of her neck and hips, intact grip, and "normal lumbar flexion, extension, lateral rotation, and lateral bending." Tr. 637; 504. Dr. VanBelois was

PAGE 22

of the opinion that Bear had fibromyalgia, but noted that she declined any medication other than Cymbalta and so recommended that she exercise regularly. Tr. 504.

The Court is satisfied based on its review of the ALJ's decision and the record as whole that the ALJ cited sufficiently specific and legitimate reasons for rejecting the limitations set forth on the residual capacity assessment form completed by Dr. VanBelois.[3]

### 2. *Dr. Gordon*

Bear next argues the ALJ failed to cite sufficiently specific and legitimate reasons for discounting a residual functional capacity assessment form completed by Dr. Gordon. Between June and August 2006, Dr. Gordon treated Bear primarily for abdominal pain, bladder problems and menopausal symptoms. Tr. 430-37. In July 2007, Dr. Gordon completed a form assessing Bear's ability to do physical work-related activities. Tr. 451-57. Dr. Gordon indicated that during any given eight-hour workday, Bear would be able to sit, stand, and/or walk for no more than three hours, would need to lie down as needed, and would need to recline or lie down for four hours without interruption. Tr. 451-57.

---

[3] Because Dr. VanBelois's residual functional capacity assessment was contradicted by the assessment of the state agency reviewing physician, the ALJ could reject it for specific and legitimate reasons. Tr. 422-29.

PAGE 23

The ALJ rejected this assessment for a number of reasons. First, the ALJ noted that Dr. Gordon's opinion was internally inconsistent in certain respects. Tr. 638. For example, while Dr. Gordon wrote that Bear could sit and stand for three hours out of an eight hour workday and walk for two, but would also need to lie down or recline for four hours at a time without interruption. Tr. 638; 452. The ALJ properly cited that internal inconsistency as a basis as one reason for rejecting Dr. Gordon's check-the-box medical assessment.

The ALJ also rejected Dr. Gordon's opinion as to the severity of Bear's limitations on the ground that he had not treated her for fibromyalgia and degenerative disc disease, but for unrelated symptoms of post surgical abdominal pain and menopause. Tr. 638; 430-37. Also, as the ALJ observed, Dr. Gordon had seen Bear only a few times during the three months he was her treating physician. Tr. 638; 430-37. Finally, the ALJ rejected Dr. Gordon's retrospective physical capacity assessment because his contemporaneous "records did not reveal significant limitations that would establish [Bear] was totally incapable of performing all types of work activity on a sustained basis." Tr. 638; 430-37. The ALJ's reading is a fair one. Dr. Gordon's notes discuss Bear's complaints of abdominal pain, menopausal symptoms, and an urgent bladder and contain nothing indicating she would be severely limited in the manner set forth in the subsequent

residual functional capacities assessment form. The ALJ has thus cited sufficiently specific and legitimate reasons for rejecting Dr. Gordon's July 2007 opinion.[4]

## IV. Conclusion

For all of the above reasons, the Court concludes that the ALJ's decision is based on substantial evidence and free of legal error. Accordingly,

IT IS ORDERED that Bear's motion for summary judgment is DENIED, the Commissioner's motion for summary judgment is GRANTED, and the Commissioner's decision is affirmed.

DATED this 13th day of June, 2013

Jeremiah C. Lynch
United States Magistrate Judge

---

[4] As discussed above, the ALJ also provided sufficiently germane reasons for rejecting Scott-Markle's "other source" opinion, and specific legitimate reasons for rejecting Dr. Mahoney's opinion.

PAGE 25